UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

KATHRYN M. BARNES )
 )
V. ) NO. 2:10-CV-235
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation, after the administrative denial of her applications for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act. They were denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 17 and 235].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 47 years old at the time of the hearing decision. She has a 12th grade education. She has past relevant work experience as a grocery store demonstrator, a breakfast room attendant, and as a cashier.

This voluminous record relates to two sets of applications. The first was for Disability Insurance Benefits only and was filed on July 26, 2005. The hearing on that application was held on May 31, 2007 (Tr. 697-717), and was denied by ALJ John L. McFadyen in a hearing decision issued June 20, 2007 (Tr. 41-48) which became the final decision on that application. The present applications for both Disability Insurance Benefits and SSI were filed on July 13, 2007. The administrative hearing on these applications, once again before Judge McFadyen, was held on January 27, 2009 (Tr. 717-30).

Plaintiff asserts that she is disabled due to a ventral hernia, obesity, osteoarthritis of the left knee, post-traumatic stress disorder, depression and anxiety. Her medical history relating to her physical impairments is set out in her brief as follows:

> From March 2005 through April 2007 Barnes was treated at the Tennessee Department of Health for her hernia, knee, and abdominal pain, obesity, borderline hypertension, GERD, diabetes, peripheral edema, anxiety, and depression. In July 2005 providers noted she was obese with a BMI of 51.9. (Tr. 153-67, 305-19).
> In March 2006 Dr. Cochran evaluated Barnes for the Agency. She weighed 327 pounds. She had tenderness over the upper thoracic vertebrae, the left posterior cervical muscles, and upper trapezius, with diminished ranges of motion. She could not squat or stand on her heels or tiptoes or on her left leg. Her straight leg raising

2

test was positive. She had pain, numbness and diminished sensation over the right lateral thigh, and 2+ pretibial edema. Dr. Cochran concluded that Barnes could lift/carry 10 pounds occasionally and 5 pounds frequently, and stand/walk for two hours and sit for one to two hours in an eight-hour day. (Tr. 205-12).

An x-ray of Barnes's left knee showed degenerative changes with additional soft tissue swelling. (Tr. 214).

In March 2006 a non-examining agency consultant claimed that Barnes could perform light work with occasional postural movements and frequent reaching overhead, handling, and fingering, with some environmental restrictions. (Tr. 216-22).

In July 2006 Barnes went to the ER with abdominal pain. Doctors noted she had edema in her left foot. An x-ray of her abdomen revealed an atypical small bowel gas pattern. (Tr. 241-45). In December and again in July 2007 Barnes suffered from abdominal pain and nausea. (Tr. 308-09, 456).

In September 2007 Dr. Hoppe evaluated Barnes for the Agency. He noted that she had a 10 cm right paraumbilical ventral hernia, an unsteady gait, and some difficulty getting up from the chair and on and off the table, and was grossly obese at 321 pounds, which affected her ability to function. He diagnosed severe PTSD, gross obesity, and arthralgias in the knees and found that she had the ability to occasionally and frequently lift less than 10 pounds and stand/walk for less than two hours or sit for less than six hours in an eight-hour day. (Tr. 462-66).

Two months later a non-examining agency consultant claimed that Barnes could perform light work without any additional limitations. (Tr. 468-74). In April 2008 another non-examining consultant claimed that Barnes could perform light work requiring only occasional postural movements. (Tr. 514-22).

In March 2009 Dr. Filka evaluated Barnes for the Agency. On exam she had multiple tender points. Postural changes were done with difficulty, as was climbing up on the exam table and going from sitting to lying and vice versa. Dr. Filka concluded that because of Barnes's chronic knee, hip arthralgias, and morbid obesity, she could not bend forward repetitively, crawl, stoop, kneel, or climb other than occasional stairs and should be allowed to change positions from sitting to standing to walking as needed. (Tr. 673-77). She further claimed that Barnes could lift/carry up to 20 pounds frequently and 50 pounds occasionally and occasionally balance. She could sit for two hours at a time, for a total of five hours, stand for one hour, for a total of two hours, and walk for one hour total in an eight-hour work day. (Tr. 679-84). An x-ray showed early osteoarthritis of the left knee. (Tr. 678).

[Doc. 18, pgs. 3-5].

The evidence of plaintiff's alleged mental impairments is summarized as follows:

From March 2005 through October 2006, Barnes received psychotherapy at Frontier Health primarily with David Brown, a therapist, whose notes and assessments were reviewed by the staff psychiatrists. She had been robbed and

3

kidnapped in 1990 and continued to have nightmares and intrusive thoughts. Providers assessed panic disorder, depressive disorder, and PTSD with a current GAF of 51 (lowest 45, highest 55). (Tr. 183-99).

At times Barnes appeared calm and stable or "clinically improved," while at others she had a flat affect, was tearful, anxious, angry, pessimistic, and depressed, had panic attacks and problems with focus due to "redundant-ruminating-obsessive thoughts," and lacked insight and motivation. She had difficulty with motivation, concentration, and task management and was anxious with limited social contacts. Psychiatrists prescribed Alprazolam, Citalopram, and Bupropion. (Tr. 184-99, 267-73, 276-78).

In February 2006 Dr. Thurman evaluated Barnes for the Agency. He assessed mild depression and anxiety with a GAF of 60, and concluded that she had a moderate anxiety in social settings and a moderate difficulty understanding and carrying out detailed instructions, coping with work-related stress, maintaining emotional stability, and interacting with others. (Tr. 200-04).

In April a non-examining agency consultant claimed that Barnes could understand/carry out simple to lower level detailed tasks while getting along with others and "adapting at that level of function." Her mood could affect her concentration, persistence, pace, and social ability such that she could not perform more complex tasks nor deal with the public except for simple situations. (Tr. 237-39, 223-33).

In mid-2006 Barnes's goal was "to keep from offing myself and to keep from winding up in the street." (Tr. 269-70). Brown concluded that Barnes was moderately limited in her activities of daily living, interpersonal functioning, in her ability to concentrate, stay on task, and adapt to change. Brown assessed her current GAF at 50 (lowest at 45, highest at 55), and concluded that it would be very difficult for her to be gainfully employed due to her ongoing anxiety, panic attacks, nightmares, paranoia, depression, frequent crying spells and difficulty communicating with others. (Tr. 187-88, 254).

Barnes continued treatment at Frontier. In November and December 2006 she had a flat affect and depressed mood, reported nightmares, and continued to talk about the robberies. She reported trouble managing her activities of daily living, limited social contact, and difficulty focusing, concentrating, and adapting. (Tr. 264-66).

In January 2007 Barnes had a flat affect and a depressed mood and received individual therapy for at least 45 minutes on three different occasions. Brown found that she would have difficulty working on a sustained basis because her paranoia and anxiety would frequently interfere with her ability to concentrate and be around others. He noted that she was not a malingerer but had been traumatized by "several life experiences" and suffered recurrent panic attacks, social paranoia, feelings of guilt/worthlessness, anhedonia, recurrent panic attacks, and persistent irrational fears. Her response to medication was limited. Seroquel was added for her paranoia, and she continued to take Bupropion, Citalopram, and Xanax. (Tr. 255-64).

The following month Dr. Whitehead examined Barnes for the Agency, noting

4

her depressed and anxious affect and mood and limited eye contact.35 Based on test results Dr. Whitehead opined that Barnes was likely exaggerating her psychological symptoms. She claimed that Barnes had only slight limitations in her ability to perform work-related activities and diagnosed PTSD, depressive disorder, NOS, malingering, and a personality disorder, with a GAF of 45. (Tr. 300, 303-04).

Barnes continued treatment at Frontier in early 2007. Her affect was flat and worrisome, depressed, anxious, or melancholy. Her motivation was poor, her energy was low, and her pace was slow, and she felt helpless, was easily distracted, and suffered from nightmares and social paranoia. Her diagnoses were panic disorder, depressive disorder, and PTSD. (Tr. 322-26, 330-32).

In February Barnes was referred to Outpatient Crisis Intervention when she reported suicidal thoughts. She denied plans to harm herself and was discharged with a GAF of 51. (Tr. 328-29). In May and again in August 2007 Barnes went to the ER complaining of insomnia and anxiety. (Tr. 445, 448-54).

From May 2007 through May 2008 Barnes continued to receive treatment at Frontier Health for her nightmares and anxiety. At times her mood was euthymic, but mostly tearful, anxious, tense, angry, and depressed with a blunt affect and feelings of being overwhelmed. (Tr. 427-38, 601-66). In July 2007 she reported "a great deal of depression and anxiety...along with panic attacks" and admitted having suicidal thoughts and difficulty concentrating. Brown concluded that Barnes's activities of daily living, interpersonal functioning, and concentration were moderately limited, but her ability to adapt to change was markedly limited. Her diagnoses were pani disorder, depressive disorder, r/o personality disorder with a GAF of 50. (Tr. 432, 435, 663-66).

In November 2007 a non-examining agency consultant claimed that Barnes "could perform simple and lower level detailed tasks with normal supervision." (Tr. 489-91).

In March 2008 Brown noted that Barnes continued to struggle with depression, anxiety, anger, and panic disorders despite consistent attendance at therapy. Her prognosis for gainful employment remained bleak. (Tr. 428).

In April, another agency consultant concluded that the evidence of record supports "as much as moderate limitations associated with [Barnes's] mental/emotional condition which represents a greater degree of limitation and symptom severity than was indicated per ALJ decision. Significant worsening appears to have occurred." (Tr. 512).

In June 2008 Barnes was hospitalized involuntarily when she revealed that she was thinking about killing her husband and herself. She related that she had been abused, raped, and held at gunpoint during a robbery and suffered from nightmares and flashbacks. Her discharge diagnoses were major depressive disorder, recurrent, severe, and an anxiety disorder, with GAF scores of 28 and 34. (Tr. 531-38, 594-96).

From June 2008 through January 2009 Barnes continued to receive psychotherapy and attend anxiety group at Frontier Health. She was depressed, anxious, angry, socially isolating, irritable, moody, and tearful and suffered from dramatic night terrors. (Tr. 542-93, 597-600).

5

> In December 2008 Brown reported that Barnes was emotionally fragile and susceptible to breakdowns, continued to struggle severely with depression, anxiety, anger, and panic disorders, experienced flashbacks to past events, and had difficulty maintaining a normal level of mental functioning, which interfered with her ability to communicate and usually resulted in withdrawal and isolation. (Tr. 539).
> Dr. Schacht, who never examined Barnes, recited some of her treatment notes. He concluded that if Barnes's reports, as reflected in the functional assessments of her treating sources, were accepted, she would equal a listing in terms of severity. If weight were given to the consultative examiner, it suggests that "there's exaggeration going on." He claimed that there was a discrepancy in the record between the subjective complaints and the objective observations. (Tr. 713-14).[1]

[Doc. 18, pgs. 5-11].

The hearing decision on the present applications was entered by the ALJ on June 24, 2009. He found that the plaintiff had severe impairments of a ventral hernia, obesity, and early osteoarthritis of the left knee. He found that the plaintiff did not have a severe mental impairment. In so finding, he recounted the testimony of non-examining "well-qualified psychologist" Dr. Thomas E. Schacht who testified at the hearing, who basically interpreted Dr. Whitehead's findings during her February 14, 2007, consultative examination of the plaintiff. He stated that the plaintiff "has not required psychiatric hospitalization." He rejected the opinions of all of the State Agency psychologists as "not being supported by credible objective evidence." He also rejected the findings and opinions of Mr. Brown, the treating therapist. (Tr. 21).

With respect to the plaintiff's RFC, he found that she had the ability to physically perform the full range of light work as defined by the regulations. (Tr. 23). He discounted

---

[1]Dr. Schacht testified at the plaintiff's first administrative hearing on her first applications for benefits held on May 31, 2007. Obviously, he did not have any of the above records from sources generated subsequent to that date, and did not testify at the hearing regarding the present applications held on January 27, 2009.

6

the testimony of Dr. Filka and Dr. Hoppe, the consultative examiners who examined the plaintiff for the Commissioner, because their "opinions are not supported by their own examination signs, findings, and X-ray results..." He accepted the opinions of "State Agency medical consultants" as "consistent" with his RFC finding. (Tr. 25). One of the "examination signs" he noted, apparently to justify his forthcoming rejection of Dr. Filka in favor of the State Agency doctor, was that Dr. Filka noted "postural changes were done without difficulty, such as getting up and off the exam table and going from sitting to lying and vice-versa." He also noted that "no treating source has indicated that the claimant is totally disabled due to pain." (Tr. 24).

The ALJ then found that with the plaintiff being capable of the full range of light work, she could return to her past relevant work as a grocery store demonstrator, a hotel breakfast room attendant, a drugstore cashier and a photo lab technician. Accordingly, he found that she was not disabled. (Tr. 25).

Plaintiff asserts that the ALJ's findings with respect to both the plaintiff's mental and physical RFC are not supported by substantial evidence. As to both, says the plaintiff, the ALJ misstated the evidence on crucial points. For example, regarding the plaintiff's physical limitations, the ALJ stated that Dr. Filka noted that "postural changes were done without difficulty, such as getting up and off the exam table and going from sitting to lying and vice versa." (Tr. 24) In point of fact, Dr. Filka said *just the opposite*, noting the difficulty she observed in the plaintiff making those postural changes. (Tr. 676). On the mental side, plaintiff points out that the ALJ stated twice that the plaintiff had not required psychiatric hospitalization (Tr. 21 and 22), when in fact she was involuntarily committed in June 2008

for stating she had thoughts of killing her husband and herself. (Tr. 531-38, 594-96). Also, she asserts that the ALJ did not mention and presumably did not take into account recent evidence regarding her mental condition from State Agency evaluators which postdate both Dr. Whitehead's 2007 exam and Dr. Schacht's 2007 testimony.

Regarding her physical capacity, the plaintiff asserts that the ALJ erred in accepting the opinion of the non-examining State Agency physician over that of Dr. Cochran, Dr. Filka, and Dr. Hoppe, all of whom examined the plaintiff for the Commissioner over the years. The Plaintiff also asserts that the ALJ did not properly evaluate her obesity.

Defendant asserts that the ALJ properly took the plaintiff's obesity into account when determining her RFC, in that the State Agency doctor upon which the ALJ relies as his medical source for the RFC knew that the plaintiff was obese, and that the ALJ found obesity as a severe impairment. Defendant also cites the unreported Sixth Circuit decision of *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 2006 WL 229795 (6th Cir. 2006). Were the handling of plaintiff's obesity the only issue under review, the Court would be inclined to agree with the Commissioner.

Regarding the finding of the plaintiff having the physical capacity for the full range of light work, defendant asserts that ALJ properly relied upon the State Agency physician over the three consultative examiners. He sites *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010) for the proposition that a non-examining State Agency source can be given precedence over an examining source if the ALJ clearly sets forth the grounds for doing so. Here, an important basis for not giving great weight to Dr. Filka was because of her supposedly finding that the plaintiff got on and off the table and raised up and down

without difficulty, which was at odds with Dr. Filka's finding of no more than sedentary exertion. As stated above, this is the polar opposite of Dr. Filka's finding of the plaintiff having difficulty in making these postural changes. The Commissioner argues that this misstatement has not been shown by the plaintiff to have not been a harmless mistake.

The Court does not accept this argument in this factual scenario for two reasons. First, the finding by an ALJ that an examining source failed to find a condition which the source did in fact find is significant *per se* if that is a basis upon which the ALJ rejects the examining source's opinion on physical capacity in favor of a non-examining source. Second, this is not a minor misread of the evidence. This is not like saying a doctor found a blood pressure of 138/79 when it was found to be 128/69. This is saying that the plaintiff can make postural changes just fine and thus the ALJ is completely justified in rejecting her complaints as being without credibility. This Court cannot say how much this misreading of Dr. Filka's report tainted everything that came after, but it is too critical a factor to this adjudication to get wrong and the Court consider "harmless" on its own.

The finding of no severe mental impairment stands on even shakier footing. There is no doubt whatsoever that the yardstick in this Circuit for deciding whether an impairment is "severe" is the de minimis standard. If Dr. Whitehead's opinion of no more than mild limitations along with Dr. Schacht's endorsement of her opinion in 2007 had been the last word on the subject, then a compelling argument could be made that her opinion provided substantial evidence for the ALJ's finding of no severe mental impairment. Of course, to so find, one would have to disregard the findings of all of the State Agency consultants who found at least moderate limitations, and completely disregard the opinions of her treating

therapist. Still, the argument could be made.

However, *long after* Dr. Whitehead's exam and report, plaintiff continued to require therapy, was hospitalized for suicidal and homicidal ideation, and was found by one subsequent State Agency psychologist to have "a greater degree of limitation and symptom severity than was indicated per ALJ decision...." referring to the first decision by ALJ McFadyen in 2007. With respect to the State Agency psychologists' findings, the ALJ did not discuss them but merely said they "were not supported by credible evidence." (Tr. 21). In some situations, where there exists strong *current* proof from examining sources, such a statement would be sufficient. But in the absence of such proof, and in the presence of proof which strongly supports the State Agency evaluators' findings, such a phrase does not fill the bill. Regarding the total misstatement regarding the plaintiff's psychiatric hospitalization, once again the Court cannot dismiss this as a harmless mistake, especially when looking for substantial evidence that the plaintiff did not clear the de minimis hurdle.

While the vast majority of the evidence, both that which the ALJ correctly interpreted and that which he got backwards, fails to support a finding that the plaintiff can do a full range of light work and does not have a severe mental impairment, the evidence does not convince this Court that benefits should be judicially ordered. There may well be a range of sedentary jobs which the plaintiff could perform, and while the Court is satisfied that the plaintiff has a severe mental impairment, the effect of such an impairment on the ability to function is still unknown and could be divined by a vocational expert. Accordingly, while the Commissioner's position in this case was far from substantially justified, a remand for further administrative proceedings is in order. Further evidence should be obtained with

Case 2:10-cv-00235-JRG-DHI   Document 23   Filed 11/22/11   Page 10 of 11   PageID #: 104

respect to both the plaintiff's mental and physical impairments. Also, should the consultative examinations, physical or mental, show more serious limitations than the ALJ wishes to find, given the history of this case, a non-examining medical consultant testifying at the hearing will most likely *not* provide substantial evidence.

Plaintiff, at page 22 of her brief, asks the Court to impose in any order of remand a paragraph to compel the Commissioner to calculate any benefits awarded "within a reasonable time," and for further action to take place on the part of the Court to enforce that paragraph. The Court declines to make this recommendation.

It is respectfully recommended, except for the inclusion of the requested paragraph described immediately above, that the plaintiff's Motion for Summary Judgment [Doc. 17] be GRANTED, and that the action be remanded for further administrative proceedings. It is also recommended that the defendant Commissioner's Motion for Summary Judgment [Doc. 21] be DENIED.[2]

                                                   Respectfully submitted:

                                                   s/ Dennis H. Inman
                                                   United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).